```
                  UNITED STATES DISTRICT COURT
                      DISTRICT OF VERMONT

AG-INNOVATIONS, INC. and      :
LARRY AND LINDA FAILLACE      :
                              :
     v.                       :
                              :      CIVIL NO. 1:02CV332
UNITED STATES DEPARTMENT      :
OF AGRICULTURE and            :
MIKE JOHANNS,                 :
SECRETARY OF AGRICULTURE      :
                              :
_____ :
```

RULING ON PLAINTIFFS' MOTION FOR JUDGMENT AND
DEFENDANTS' CROSS-MOTION FOR JUDGMENT
(Papers 51 and 57)

The parties' motions for judgment address the final chapter of a dispute discussed in a series of rulings in this and a related case, familiarity with which is presumed.  See, e.g., Ag-Innovations, Inc. v. U.S. Dep't Agric., 95 Fed. Appx. 384 (2d Cir. 2004); Ag-Innovations v. U.S. Dep't Agric., 6 Fed. Appx. 97 (2d Cir. 2001).

Briefly, on July 14, 2000, the United States Department of Agriculture (hereinafter "USDA" or the "agency") issued an administrative order by which it seized and destroyed plaintiffs' imported East Friesian milk sheep and any associated sperm and embryos ("germ plasma").  This order was issued in conjunction with a Declaration of Extraordinary Emergency which stated that a transmissible spongiform encephalopathy ("TSE") of foreign origin had been detected in several of plaintiffs' sheep.

1

In a related action, the plaintiffs were ultimately unsuccessful in avoiding the destruction of their seized flock. See 6 Fed. Appx. at 98 (finding the flock's destruction rendered plaintiffs' appeal moot). In this action, the plaintiffs challenge the legality of the quarantine related to the flock's seizure. On August 26, 2002, the agency issued an order quarantining certain animals and areas of the plaintiffs' property for a period of four years. See generally Ruling on Defendants' Partial Motion to Dismiss (Mar. 10, 2005)(Paper 30). According to the defendants, the quarantine period is set to expire on March 23, 2006. See Defs' Opp. to Mot. for J. (Paper 56) at 6 ("Pursuant to this Order, no ruminant animals shall be raised or kept on the premises until March 23, 2006.").

In this motion, plaintiffs request a declaratory ruling reversing the agency's quarantine order and awarding costs, fees and other appropriate relief. See Paper 51 at 1. As framed by the plaintiffs, "the [remaining] question before the Court is whether the Secretary and United States Department of Agriculture ("USDA") can offer any rational justification for their imposition of a quarantine of plaintiffs' farm premises." Mem. in Support of Mot. for J. (Paper 52) at 1. Accordingly, the parties recognize this motion does not present an opportunity to reargue the merits of the agency's decision to seize and destroy plaintiffs' flock, but simply to look at the legality of the

temporary, attendant quarantine imposed on plaintiffs' property and restrictions placed on their ability to raise certain forms of livestock.

The Administrative Procedure Act, 5 U.S.C. § 701, et seq. (hereinafter "APA") provides the standard of review of the USDA's quarantine action.  "Under the APA, this Court reviews errors of law de novo. . . . Regarding other agency findings, conclusions, and actions, the reviewing court shall hold them unlawful and set them aside if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000)(citations omitted).

As the Supreme Court has explained, an agency's action is "arbitrary and capricious" if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  In addition, "an agency decision is entitled to a presumption of regularity, and the burden of proof is on the party challenging the agency's

3

decision."  Vermont Pub. Interest Res. Group v. U.S. Fish & Wildlife Serv., 247 F. Supp. 2d 495, 505 (D. Vt. 2002).

In mid-July 2000, the USDA issued and published in the Federal Register a Declaration of Extraordinary Emergency which stated a TSE of foreign origin had been detected in several sheep in Vermont and any sheep affected or exposed, and their germ plasma, had to be destroyed.  See 95 Fed. Appx. at 385.  Under either 7 U.S.C. § 8306(c)(1) or its progenitor, 21 U.S.C. § 134a(c), the USDA has broad authority to take actions such as imposing a quarantine, where such action is necessary to prevent the dissemination of disease, such as could be caused by the type of prion proteins at issue in this case.  See 7 U.S.C. §§ 8302(3) and 13(I)("Pest" includes "A prion.").

This Court already has determined the agency's issuance of the Declaration of Extraordinary Emergency was not arbitrary and capricious.  See Ag-Innovations, Inc. v. U.S. Dep't Agric., No. 1:00CV257, Mem. of Decision at 3-4 (D. Vt. Feb. 6, 2001), dismissed as moot, 6 Fed. Appx. 97 (2d Cir. 2001).  Examining the administrative record as of February 2001, this Court noted inter alia:

> [1] BSE ["bovine spongiform encephalopathy"] can be transmitted to sheep by feeding them infected cattle brain, even in very small amounts (0.5 g).
>
> [2] BSE in sheep cannot be differentiated from scrapie, the naturally occuring TSE of sheep and goats, via routine diagnostic methods.  The only available method of differentiation uses a mouse bioassay system

requiring a minimum of 2-3 years.  Although scrapie is not considered a human health risk, BSE is the most likely cause of variant Creutzfeld-Jakob Disease (vCJD), a fatal human disease.

[3] BSE in sheep appears to cause infectivity in more tissues than does BSE in cattle and - unlike BSE in cattle - may spread from one sheep to another.

[4] If BSE occurs naturally and behaves like scrapie (i.e., is transmitted from one sheep to another), bans on the feeding of mammalian protein to sheep will not prevent the spread of the disease.

[5] Some evidence suggests that until the mid-1990s, it was common practice in many European countries, including Belgium, to feed meat and bone meal (MBM) to sheep.  Since the European Union (EU) has imported significant amounts of BSE-contaminated MBM from the United Kingdom (UK), it is highly likely that sheep in the EU have been exposed to the BSE agent.

[6] Under a small window of opportunity, 65 head of sheep were imported into the United States from Belguim in 1996.  We recently have been informed that some of the sheep actually originated in the Netherlands and that all of the sheep were imported with no certifications concerning their feeding history.  If the sheep had remained in Europe and had been presented for slaughter, the European authorities probably would have prohibited tissues from these animals from entering the human food supply.

[7] The imported sheep could have been exposed to BSE and could be incubating the disease.  If sold throughout the country, they potentially could spread the disease masked as scrapie. (Scrapie is endemic in the United States.)  In this case, the FDA ban on the feeding of mammalian protein to ruminants would not prevent the spread of disease, and the United States would face a risk of fatal human disease risk not currently known to exist here.

[8] Six of nine of the sheep with interpretable test results have some evidence of brain lesions.  Though we do not know the significance of these lesions in this breed of sheep, the changes may suggest a degenerative

>neurological condition such as that caused by the BSE agent.
>
>[9] Eliminating the possibility of risk associated with these sheep may take longer than a decade.  If we wait and do nothing until we have all of the answers, we may be allowing the disease to spread and may compromise our ability to eliminate it from the United States.  This was the case with scrapie.  The first case was diagnosed in 1947, control measures were implemented in 1952, and we are still trying to eliminate it.  The stakes with the imported sheep are much higher as BSE is considered a potential human pathogen.

Id. at 5-6 (quoting the Expanded Record at 195-96).  "In short, the administrative record contains sufficient facts to support the Secretary's Declaration of Extraordinary Emergency because the continued presence of the plaintiffs' sheep pose[d] a serious and substantial risk of spreading disease as contemplated by 21 U.S.C. § 134a(b)."  Id. at 9.

These underlying considerations, as well as subsequent, undisputed facts, establish the legality of the agency's quarantine under the arbitrary and capricious standard.  It is undisputed that, through subsequent testing, the agency's scientists have been unable to conclusively determine whether abnormal prior proteins originally detected in the plaintiffs' flock are actually evidence of a foreign, atypical strain of a TSE or BSE.  See generally Paper 56 at 5-6 and 14, and portions of the administrative record cited therein.  Yet, agency experts have found abnormalities which, if ultimately determined to be a TSE of foreign origin, could have resulted in immeasurable damage

6

to citizens and livestock absent the imposition of a quarantine of the land on which the flock had grazed.

Two of the plaintiffs' sheep did test positive for an abnormal prion protein, using the monoclonal antibodies. Evidence suggests that abnormal prion proteins in sheep can be transmitted during the lambing process to pasture lands, where they may survive for years. These are among the factors which supply sufficient reliable evidence to support the agency's decision to impose a quarantine. See generally Paper 56 at 5-6 and portions of the administrative record cited therein.

Based, therefore, on the information which the agency had at the time of the Declaration of Extraordinary Emergency and as subsequently updated through lengthy and complicated testing procedures, the agency's quarantine is not arbitrary and capricious. See Supplemental Declaration of Michael Doerrer (Paper 47) at para. 5 ("Furthermore, an independent expert stated that, even if the problems that existed at the laboratory later in 2003 had been present at the time the Western blot test results were run more than a year earlier, he was still able to conclude that the Western blot evidence for TSE-positive brain samples was 'irrefutable' and that TSE infection was in fact present within the Vermont flock."); see also Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87 (1983) ("A reviewing court must generally be at its most deferential" when

an agency "is making predictions, within its area of special expertise, at the frontiers of science.").

The defendants' Motion for Judgment (Doc. 57) is GRANTED, and the plaintiffs' Motion for Judgment (Doc. 51) is DENIED.

SO ORDERED.

Dated at Brattleboro, Vermont, this 24th day of February, 2006.

                                        /s/ J. Garvan Murtha
                                        J. Garvan Murtha
                                        United States District Judge